**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
Angela Kwon (AK 1396)
Taimur Alamgir (TA 9007)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ————————————————————— x | |
| GUOLIANG MA, ELIZABETH PEGUERO, SHARON MANIER, and KIN FAI LAU, on behalf of themselves and all others similarly situated, | : Case No: |
| Plaintiffs, | : **CLASS ACTION COMPLAINT** |
| v. | : |
| | : **Demand for Jury Trial** |
| HARMLESS HARVEST, INC., | : |
| | : |
| Defendant. | : |
| ————————————————————— x | |

     Plaintiffs GUOLIANG MA, ELIZABETH PEGUERO, SHARON MANIER, and KIN FAI LAU ("Plaintiffs"), on behalf of themselves and all others similarly situated, and by and through their undersigned counsel, allege the following based upon their own personal knowledge and the investigation of their counsel:

<u>**NATURE OF THE ACTION**</u>

    1.    Coconut water is the naturally occurring liquid from the inside of a coconut. In or about 2004, entrepreneurs introduced packaged coconut water drinks sourced from tropical countries such as Brazil and Thailand to the United States. Naturally hydrating with its rich

electrolyte contents such as potassium and low in calorie, packaged coconut water has since become a grocery store staple and a natural alternative to sports drinks. In a matter of a mere decade, the industry of packaged coconut water has exploded into one of the fastest growing beverage categories in the United States grossing hundreds of millions of dollars a year.

2.      The coconut water industry faces challenges, however, most notably from the consistency of raw material, especially when the manufacturer sources its coconuts in Asia where the plantations are very fragmented and the supply of raw coconut fruits unreliable.[1]

3.      Concern with a steady supply of raw coconut is more urgent in the organic sector, especially in Asian countries such as Thailand where organic farmland is scarce. According to a Research Institute of Organic Agriculture (FiBL) and International Federation of Organic Agriculture Movements (IFOAM) report from 2014, the overall percentage of organic agricultural land in Thailand is a mere 0.16%, as opposed to some of the developed world where the percentage of organic agricultural land makes up as much as 30% of all agricultural land in those countries, such as Falkland Islands and Liechtenstein.[2]

4.      More importantly, organic coconut farmlands do not just appear overnight. Converting a coconut plantation from conventional to organic takes time – organic certification requires that crops do not receive any synthetic chemicals including fertilizers or pesticides for three (3) years prior to the harvest of the crops. *See* 7 C.F.R. § 205.202.

---

[1] See Nunes, Keith, *Success challenges coconut water sector,* Food Business News, January 1, 2014, available at http://www.foodbusinessnews.net/articles/news_home/Financial-Performance/2014/01/Success_challenges_coconut_wat.aspx?ID=%7B3E5C79CC-FAE7-41E3-AC87-FF07E9136219%7D&cck=1.
[2] See *The World of Organic Agriculture: Statistics and Emerging Trends 2014*, FiBL and IFOAM, p. 43-44, *available at* https://www.fibl.org/fileadmin/documents/shop/1636-organic-world-2014.pdf.

5.      Closely related to the growing organic coconut water market is the trend that American consumers increasingly and consciously seek out organic foods. Consumers value the "organic" label for a myriad of reasons, including perceived benefits of avoiding disease, attaining health and wellness, helping the environment, assisting local farmers, assisting factory workers who would otherwise be exposed to synthetic and hazardous substances, and financially supporting the companies that share these values.

6.      "Raw" juices are a specific category of fruit and vegetable juices that are extracted in a manner to retain as many nutrients and live enzymes as possible.  Because raw juices are unpasteurized and untreated, they must be consumed within days of their production. This short lifespan, in conjunction with premium ingredients, makes raw juice quite expensive. Nonetheless, more and more consumers specifically seek out and pay the premium for raw juice because of the health benefits that live enzymes, probiotics, nutrients and vitamins offer over conventional, pasteurized products.

7.      Hoping to capture this growing market, Defendant made a series of representations (detailed below) which are specifically targeted at such values held dear by consumers. Most importantly, through its widespread marketing campaign, Defendant labeled, packaged and advertised its Products as "100% ORGANIC" and "USDA ORGANIC" (the "100% organic claims") and "100% RAW" (the "raw claims") even though Defendant, upon information and belief, knew that its Products have not been solely made from organic coconuts and were not "raw."  Defendant deceived and misled consumers into paying a sizable pricing premium that they would not have paid had they known the truth about Defendant's Products.

3

8.      This is a proposed class action against Harmless Harvest, Inc. ("Harmless Harvest" or "Defendant") for false and misleading "100% ORGANIC", "USDA ORGANIC" and "100% RAW" representations on its Harmless Harvest® 100% Raw Coconut Water (later renamed "Harmless Coconut® Water") product labels and in their advertising campaign, even though Defendant, upon information and belief, knew that at least a significant portion of the Defendant's coconut supply had neither been in fact 100% organic nor USDA-certified organic.

9.      Defendant's Harmless Harvest® coconut water products are sold in 8 oz. and 16 oz. bottles and in the following flavors:

        A.      Harmless Harvest® 100% Raw Coconut Water (later named as the Harmless Coconut® Water);

        B.      Harmless Harvest® 100% Raw Coconut Water – Dark Cacao;

        C.      Harmless Harvest® 100% Raw Coconut Water – Cinnamon & Clove;

        D.      Harmless Harvest® 100% Raw Coconut Water – Fair Trade Coffee (together, the "Coconut Water Products" or "Products").

10.     Defendant deceptively and misleadingly misrepresented on their Product labeling and packaging and in their marketing and advertising campaign material that their Products are "100% ORGANIC," "USDA ORGANIC," and "100% RAW," even though a significant portion of its coconuts were not organic.  By deceiving consumers about the nature, quality, and/or ingredients of the Products as detailed herein, Defendant was able to command a premium price for such Products and take away market share from competing products, thereby increasing its own sales and profits.

11.     Specifically, Defendant purposefully and knowingly (i) purchased coconuts from coconut plantations which have no organic certification; (ii) purchased coconuts from street vendors whose source of supply is unknown; (iii) purchased "green-washed" coconuts from "brokers" who would certify that the coconuts are organic even though they are not; (iv) caused farmers to sign a "Farmer's Agreement" promising to use organic farming techniques without testing soil sample; and (v) conspired with the organic certifier Bioagricert in obtaining fraudulent organic certification.

12.     Defendants' representations that the Products are "100% Raw" were false and misleading, as the Products are not 100% raw and lack the traditional characteristics and qualities associated with raw products.

13.     Consumers lack the ability to test or independently to ascertain the accuracy of a food or beverage label, especially at the point of sale. Reasonable consumers must and do rely on the food or beverage company to report honestly whether a product is organic.

14.     Food and beverage companies intend for consumers to rely upon its representations, and reasonable consumers do in fact so rely. The food and beverage company's representations are the only source of information consumers can use to make decisions concerning whether to buy and ingest packaged foods and beverages.

15.     As a result of its false and misleading labeling, packaging and marketing campaign, Defendant was able to sell its Coconut Water Products deceptively and misleadingly labeled as "100% ORGANIC," "USDA ORGANIC" and "100% RAW" to hundreds of thousands of consumers throughout the United States and to realize sizeable profits.

16.    Defendant's false and misleading representations and omissions violate state laws as detailed more fully below, including New York General Business Law § 349, California's Organic Products Act, California's Unfair Competition Law, California's Consumers Legal Remedies Act, and common law.

17.    Defendant violated statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

a.  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*

b.  Alaska Unfair Trade Practices and Consumer Protection Act, Ak_ Code § 45.50.471, *et seq.;*

c.  Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*

d.  Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*

e.  California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*

f.  Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*

g.  Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*

h.  Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*

i.  District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*

j.  Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*

k.  Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*

l.  Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*

m.  Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*

n.  Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*

o.  Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*

p.  Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*

q.  Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*

r.  Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*

s.  Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*

6

*t.* Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq,,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*

*u.* Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*

*v.* Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

*w.* Michigan Consumer Protection Act, § § 445.901, *et seq.;*

*x.* Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*

*y.* Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*

*z.* Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*

*aa.* Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*

*bb.* Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*

*cc.* Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*

*dd.* New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.;*

*ee.* New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*

*ff.* New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*

*gg.* New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*

*hh.* North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*

*ii.* North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*

*jj.* Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*

*kk.* Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*

*ll.* Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*

*mm.* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*

*nn.* Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*

*oo.* South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*

*pp.* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*

*qq.* Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*

*rr.* Texas Stat. Ann. §§ 17.41, *et seq.,* Texas Deceptive Trade Practices Act

*ss.* Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*

*tt.* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*

*uu.* Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*

*vv.* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*

*ww.*     West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*

*xx.* Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*

*yy.* Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

18.     Plaintiffs bring this action to stop Harmless Harvest's deceptive and misleading practices.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

20.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

21.     The Court has jurisdiction over the state law claims because they form part of the same case or controversy under Article III of the Unites States Constitution.

22.     The Court has personal jurisdiction over Defendant because their Products are advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; Defendant are authorized to do business in New York State; and Defendant have sufficient minimum contacts with New York and/or otherwise have intentionally availed themselves of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

23.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiffs PEGUERO and LAU are citizens of New York.  Plaintiff LAU resides in this District, and purchased the Products in Nassau County, in this District. Moreover, Defendant distributed, advertised, and sold the Products, which are the subject of the present Complaint, in this District.

## PARTIES

24.     Plaintiff ELIZABETH PEGUERO is, and at all times relevant hereto has been, a citizen of the State of New York and resides in New York County. Plaintiff PEGUERO purchased several units of Harmless Harvest's Coconut Water Products over the last several years at retail prices at various grocery stores in New York County, including Whole Foods.  In doing so, she saw and relied upon the representation on the Product labels and on Defendants' website at www.harmlessharvest.com that the Coconut Water Products was "USDA ORGANIC,"  "100% ORGANIC" and "100% RAW" in deciding to purchase them. She reasonably believed the Coconut Water Products were 100% organic and 100%  raw, as labeled, and the "USDA ORGANIC,"  "100% ORGANIC" and "100% RAW" representations were a significant reason for her purchases. The purchase price ranged from $5.49 to $6.99 (or more) per 16 oz. container and $2.99 (or more) per 8 oz. container. Plaintiff PEGUERO purchased the Products at a premium price and was financially injured as a result of Defendant's deceptive conduct as alleged herein.

25.     Plaintiff GUOLIANG MA is, and at all times relevant hereto has been, a citizen of the State of California and resides in San Francisco County. Plaintiff MA purchased several units of Harmless Harvest's Coconut Water Products over the last several months at retail prices at

various grocery stores in San Francisco County, including Whole Foods.  In doing so, he saw and relied upon the representation on the Product labels and on Defendants' website at www.harmlessharvest.com that the Coconut Water Products was "USDA ORGANIC," "100% ORGANIC" and "100% RAW" in deciding to purchase them.  He reasonably believed the Coconut Water Products were 100% organic and raw, as labeled, and the "USDA ORGANIC," "100% ORGANIC" and "100% RAW" representations were a significant reason for his purchase. Plaintiff MA has purchased the Products in various flavors and sizes as they have become available. The purchase price ranged from $4.99 to $5.49 (or more) per 16 oz. container and $2.69 (or more) per 8 oz. container. Plaintiff MA purchased the Products at a premium price and was financially injured as a result of Defendant's deceptive conduct as alleged herein.

26.     Plaintiff SHARON MANIER is, and at all times relevant hereto has been, a citizen of the State of California and resides in Riverside County. Plaintiff MANIER purchased Harmless Harvest's Coconut Water Products over the last several years at retail prices at various grocery stores in Riverside County.  In doing so, she saw and relied upon the representation on the Product labels that the Coconut Water Products were "USDA ORGANIC," "100% ORGANIC" and "100% RAW" in deciding to purchase them. She reasonably believed the Coconut Water Products were 100% organic and raw, as labeled, and the "USDA ORGANIC," "100% ORGANIC" and "100% RAW" representations were a significant reason for her purchases. The purchase price ranged from $5.49 to $6.99 (or more) per 16 oz. container and $2.99 (or more) per 8 oz. container. Plaintiff MANIER purchased the Products at a premium price and was financially injured as a result of Defendant's deceptive conduct as alleged herein.

27.     Plaintiff KIN FAI LAU is, and at all times relevant hereto has been, a citizen of the State of New York and resides in Kings County. Plaintiff LAU purchased several units of Harmless Harvest's Coconut Water Products over the last several years at retail prices at various grocery stores in Nassau County.  In doing so, he saw and relied upon the representation on the Product labels that the Coconut Water Products were "USDA ORGANIC," "100% ORGANIC" and "100% RAW" in deciding to purchase them. He reasonably believed the Coconut Water Products were 100% organic and raw, as labeled, and the "USDA ORGANIC," "100% ORGANIC" and "100% RAW" representations were a significant reason for her purchases. The purchase price ranged from $5.49 to $6.99 (or more) per 16 oz. container and $2.99 (or more) per 8 oz. container. Plaintiff LAU purchased the Products at a premium price and was financially injured as a result of Defendant's deceptive conduct as alleged herein.

28.     Had Plaintiffs known at the time that the Coconut Water Products they purchased were not organic or raw as promised, they would not have purchased the Coconut Water Products.

29.     Defendant Harmless Harvest, Inc. ("Defendant" or "Harmless Harvest") is a Delaware Corporation, with its principal place of business located at 200 Green Street, Suite 1, San Francisco, CA 94111 and an address for the service of process at The Corporation Service Company, 2711 Centerville Rd., Wilmington, DE 19808. Defendant, directly and through its agents, has substantial contacts with and receives benefits and income from and through the States of New York and California. Defendant is the owner of the "Harmless Harvest®" brand and it imports, advertises and sells the Coconut Water Products in the United States. Additionally, by and through its majority-owned subsidiary in Thailand, Harmless Harvest (Thailand), Co. Ltd.,

Defendant also manufactures the Coconut Water Products in Thailand and exports the same from Thailand to the United States.

## FACTUAL ALLEGATIONS

**Defendant Falsely Represented That Its Products Are "100% ORGANIC," "100% RAW," and "USDA ORGANIC"**

30.     As part of its extensive nationwide marketing campaign, Harmless Harvest actively promotes its Coconut Water Products as being "100% ORGANIC," "USDA ORGANIC" and "100% RAW" and deceives and misleads consumers through the Product labeling and packaging, as well as an advertising campaign on www.harmlessharvest.com, and through social media such as Facebook, Twitter, Instagram and Pinterest.

31.     Harmless Harvest launched the Harmless Harvest® brand in 2011 selling and distributing packaged coconut water Products in the United States. Initially selling only the original flavor coconut water, the brand has since undergone product line changes and has sold at least 4 flavors, each in 8 oz. and 16 oz. bottles (some of which products have since been discontinued):

     A.  Harmless Harvest® 100% Raw Coconut Water;

     B.  Harmless Harvest® 100% Raw Coconut Water – Dark Cacao;

     C.  Harmless Harvest® 100% Raw Coconut Water – Cinnamon & Clove;

     D.  Harmless Harvest® 100% Raw Coconut Water – Fair Trade Coffee (together, the "Coconut Water Products" or "Products").

32.     The Products have been distributed to almost all major cities in the United States and have been sold at supermarkets, convenience stores, delis, cafes, restaurants as well as gyms and yoga centers.

12

33.     The front panel of the Product label formerly represented in large font "100% RAW COCONUT WATER."[3] Right beneath the "100% RAW COCONUT WATER" representation was an image of a hand-held, cut-open coconut which prominently represented a "USDA ORGANIC" sticker. In or about September 2015, Defendant changed the name of the original flavored Products to "Harmless Coconut Water."



http://www.themanual.com/food-and-drink/harmless-harvest-introduces-fair-trade-coffee-coconut-water/

34.     On the back panel of the Product label next to the barcode was prominently represented "100% ORGANIC."

---

[3] Defendants dropped the phrases "100% Raw" and "100% Organic" from the name of their Products in September 2015.



http://www.steamednotfried.com/harmless-harvest-coconut-water

35.   The back panel of the Product label is plastered with Defendant's brand narrative,

which is made sure to repeatedly mention the word "organic"

> "**PROPRIETARY HARVEST** Our young & green coconuts are hand-picked & bottled
> at the perfect moment for peak nutrient levels from old-growth, *organic* groves in the
> pristine regions of Southeast Asia."

14

"**NO COMPROMISE** Unlike some other coconut waters, this is NOT a heated, ultra-processed blend, but the real, unadulterated water of fresh, young, *organic* coconuts."

36.     Harmless Harvest also actively promoted its Products as being "USDA ORGANIC" and "100% ORGANIC" through an extensive and wide-reaching online advertising campaign. On Harmless Harvest's website, www.harmlessharvest.com, an entire webpage devoted to "sourcing" described how its purportedly organic coconuts were sourced:

"Harmless Harvest's focus is our sourcing. From day one, we chose *organic* ingredients as a non-negotiable aspect of our products."

"*Organic* certification is the only way to verify that specific practices are being implemented. These foods are never irradiated and are produced without the use of genetically modified organisms (GMO's), relatively recent technologies without sufficient research proving their safety. The certification also confirms food is produced *without the use of persistent pesticides, synthetic fertilizers*, or sewage sludge. Not only do these substances use energy and resources in their production, they also contribute to soil degradation and ocean dead zones. Without *organic* certification, there is no way to prove that *organic* practices are used."

"Forming partnerships with communities that value quality and *organic* farming practices is rooted in our attention to long-term growth. These partnerships offer a stable option for employment and income where there once was none."

"Happily, our promise of a long-term presence is acting as an incentive to others. We are in a position to help certify farmers who convert to *organic* farming methods and are approved through audit. This creates healthier environments with less chemical fertilizers and pesticides, and communities with long-term steady incomes."

Harmless Harvest also specifically claimed:

"We believe that *if you have nothing to hide*, you should tell it straight. Some people might be interested.

*100% Organic: The '100% Organic' label is applicable to any product in which all of the ingredients are organic…"*

See **EXHIBIT 1**, Screenshot from Harmless Harvest's website.

15

37.     On its Facebook page, Harmless Harvest described its Products as the "First Ever RTD 100% Raw & Organic Coconut Water." *See* **EXHIBIT 2**. Moreover, each and every posting on Defendant's Facebook Timeline touted that all of its farms were "*100% Organic.*" *Id.*

**Defendant Fraudulently Sourced Non-Organic Coconuts and Misrepresented Them as Organic**

38.     While a lie told often enough might become the truth, a non-organic coconut does *not* become an organic one just because it has been repeatedly labeled and extensively advertised as organic. Through a medley of conscious ignorance and outright fraud, Defendant deceived the public about the fact that their Coconut Water Products are neither 100% organic nor USDA-certified organic.

39.     As of late 2015, Defendant still was bottling coconut water from non-organic sources and labeling them as "100% ORGANIC" and "USDA ORGANIC." Defendant was sourcing 300,000 coconuts per day from Ratchaburi, Thailand, even though such area's certified organic coconut plantations could only yield about half the amount. Based on live interviews in Bangkok with suppliers of Defendant, Defendant sourced large quantities of non-organic coconuts through various avenues, including buying non-organic coconuts from retailers, making on-the-spot purchase from non-organic farms, as well as "green washing" its coconuts from non-organic sources.

***The Numbers Don't Add Up***

40.     Soon after Defendant launched the Harmless Harvest brand in early 2011, it started to source from coconut plantations in Thailand in the Ratchaburi province where the coconut variety "Nam Hom" grew.

41.     In or about June 2011, Defendant started sourcing coconut supplies sufficient to ship 2 ocean containers of Coconut Water Products, with one ocean container containing approximately 70,000 8-ounce bottles of coconut water. Because each coconut yields approximately 8 ounces of coconut water, less spillage and waste in the extracting and bottling process, the amount of coconut supply needed for a container's load of bottled coconut water roughly equals 72,000 coconuts. As such, 2 ocean containers of coconut waters would require approximately 144,000 coconuts. Originally, Defendants bottled their Coconut Water Products through a third party supplier.

42.     In the following months, Defendant's demand for coconut soared and reached 7-8 containers per month. Supply of organic coconuts struggled to catch up, however, because at the time there was only a very limited amount of organic coconut farmland in the region and the organic certification process takes time.

43.     In order to take advantage of the rapidly expanding coconut water market in the United States and gain an edge in the competition for market share, in February 2013, Defendant incorporated Harmless Harvest (Thailand), Co. Ltd. ("Harmless Harvest Thailand"), Harmless Harvest's majority-owned subsidiary in Thailand.

44.     In June 2013, Defendant started operating its factory in Thailand through Harmless Harvest Thailand, where it extracted, collected and bottled coconut water. Harmless Harvest Thailand also handles the exporting of the Coconut Water Products from Thailand to the United States.

45.     Neither Defendant nor Harmless Harvest Thailand has ever owned any farmland themselves due to Thailand's law against land ownership by foreigners or foreign corporations.

17

Instead, Harmless Harvest has to, and continues to, rely on contract farming for its coconut supply, or purchase coconuts from either suppliers or farmers who own coconut plantations.

46.     Based on Plaintiffs' investigation and review of export shipping records, during the period between July and October 2013, Harmless Harvest's volume of Coconut Water Products averaged 30 containers per month, or about 7-8 ocean containers of coconut water per **week**. As Defendant's production picked up speed, in October 2013, Harmless Harvest was shipping 10 containers per week.

47.     Such a volume exported by Defendant would normally require approximately **6,000 rais** (a unit of area commonly used in Thailand; 1 rai equals approximately 0.395 acre of area) of organic coconut farmland area. Based on interviews with local Thai farmers, coconuts are harvested approximately every 23 days and each rai of organic coconut plantation yields approximately 500 coconuts each harvest. Defendant somehow made do with a mere **800 - 1,000 rais** of certified organic coconut Nam Hom coconut plantation it had contracted at the time.

48.     At the time Harmless Harvest started producing 8-10 containers a week of "certified organic" coconut water, there were, besides a handful of small farms, only two active large Nam Hom coconut farms with organic certification in Thailand. One is under the name Family Export Co., Ltd., which had 1,500 rais (600 acres) certified by one of the two organic certifiers in the area, Control Union. However, they did not supply coconut water shipped by Harmless Harvest Thailand.

49.     The other large farm with organic certification is Dechathon Fruits Safety Control NOP Small and Micro Union Community Enterprise, referred to in the local industry as "DCT Fresh," with 800 rais (320 acres) organic farm also certified by Control Union. While such acreage

18

could not produce more than 17,000 (800 (rais) x 500 (coconuts/rai) / 23 days) coconuts daily during peak season, DCT Fresh was supplying Harmless Harvest with "organic" coconuts at a far greater speed: over 100,000 coconuts daily.

50.     3,825 acres equal approximately 9,674 rai of farmland. Such acreage of coconut plantation cannot possibly yield the amount of coconuts Defendant was sourcing: 300,000 coconuts per day, which, based on the current yield of coconut plantations in Ratchaburi, Thailand, would require approximately 18,000 rai of land area (300,000 coconuts per day x 30 days / 500 coconuts per month = 18,000 rai). Simply put, Defendant still does not have large enough certified organic coconut plantation area to support the rate at which it was shipping coconut water from Thailand – not even according to its *own* representations.

51.     Upon information and belief, the following chart represents a rough chronology of Harmless Harvest's sourcing demand vis-a-vis the expansion of its certified organic farmland.

| | No. of Containers Shipped **per month** | No. of Coconuts Sourced **per month** | Organic Land Area Required (Rai) | Organic Land Area Certified (Rai) | % of **Organic Coconuts Out of All Coconuts Sourced by Harmless Harvest** | % of **Non-Organic Coconuts Out of All Coconuts Sourced by Harmless Harvest** |
|---|---|---|---|---|---|---|
| June 2011 | 2 | 144,000 | 288 | 20 | 7% | **93%** |
| July – Oct. 2013 | 30 | 2,160,000 | 4,320 | 800-1,000 | 19-23% | **77-81%** |
| Aug. – Oct. 2015 | | 9,000,000 | 18,000 | 9,674 | 53.7% | **46.3%** |

52.     While the area of organic coconut farm land contracted by Harmless Harvest has gradually increased since its inception, it has never caught up with the expansion of Harmless

19

Harvest's sourcing need. As a result, as of October 2015, approximately half of Defendants' coconut farmland was still non-organic.

***Coconuts from Street Vendors with Unknown Source or Non-Organic Farms***

53.     It is widely believed in the local community that Harmless Harvest, in its shopping spree for coconuts, would literally buy any coconut that comes its way with no regard whatsoever to whether such coconuts are organic or not and more often than not at inflated prices. To avoid damage liability, Harmless Harvest simply purchases coconuts from 3rd party suppliers and vendors, who are willing to represent that their coconuts supplied are organic, when they are not.

54.     For example, a region near Bangkok named Baan Paew in the Samut Sakorn province is known for being a coconut retail center and has numerous small coconut vendors selling coconuts along its streets. These coconuts come from any number of non-organic coconut farms. It is widely believed in the region that Harmless Harvest's buyers would frequently purchase coconuts from these street vendors when it is short on coconut supply. Below is a picture of a street coconut vendor taken in Baan Paew, Samut Sakorn, Thailand.



Street vendor selling coconuts in Baan Pawe, Samut Sakorn, Thailand

55.     Harmless Harvest would also make on-the-spot purchase from coconut farms that are conventional farms. When such purchase took place, the farmer is never required to sign any paperwork or produce any certification with respect to organic farming.



A coconut farm in Baan Paew, Samut Sakorn, Thailand

***"Green Washed" Coconuts***

56.     However, upon information and belief, the majority of non-organic coconuts enter Harmless Harvest's supply chain through a process called "green washing." In Thailand, coconut farms are usually small and fragmented and owned by individuals or families who typically inherited the land from their ancestors. The farm owners would contract with a middleman referred

to as the "broker," who is typically responsible for hiring workers to work on the farm as well as purchasing the coconuts from the farmers. Because there are crops per year and coconuts require little maintenance, most owners simply reap profits without significant "farming" efforts. The conversion of a conventional farm into an organic farm takes at least 3 years, many farms would have a small portion of converted farm land even though the majority of the land has not been converted. When a broker purchases coconuts from the farmers and resells to Harmless Harvest, they would vouch for the coconuts being organic by creating a purported "Certificate of Inspection," commonly referred to by the locals as the "COI." In this way, large amounts of non-organic coconuts enter the supply chain of Harmless Harvest camouflaged as organic coconuts.

**Defendants' Farmer Operators Failed to Fulfill the 3-Year Conversion Required by the USDA**

57.     Problems with Defendant's organic sourcing practices run still deeper. Even with respect to the portion of Harmless Harvest's coconut supply which are actually "certified" as organic, it is still questionable whether these coconuts are in fact organically grown in an organic farm which has complied with federal law.

58.     Organic foods are regulated under the federal standards set by the United States Department of Agriculture ("USDA") National Organic Program ("NOP"), 7 C.F.R. § Part 205. These standards were implemented in 2002 in the wake of the Organic Foods Production Act of 1990. Organic standards address many factors: soil quality, animal raising, pest and weed control, and use of input materials.

59.     There are four distinct labeling categories for certified organic food products: (1) 100% Organic, (2) Organic, (3) Made with organic (specific ingredients or food groups), and (4) Products with less than 70 percent organically produced ingredients. *See* 7 C.F.R. §205.301. Where

a product is labeled as "100% Organic," needless to say, must contain "100 percent organically produced ingredients." 7 C.F.R. §205.301(a).

60.     Further, the USDA requires that "[a]ny field or farm parcel from which harvested crops are intended to be sold, labeled, or represented as 'organic,' **must have had no [synthetic chemicals including fertilizers or pesticides] applied to it for a period of 3 years immediately preceding harvest of the crop**." *See* 7 C.F.R. § 205.202 ("Land Requirements"); *see also*, Organic Production and Handling Standards, National Organic Program, United States Department of Agriculture ("[t]he organic crop production standards require that [l]and must have had no prohibited substances applied to it for at least 3 years before the harvest of an organic crop").[4] Any agricultural product labeled as "100 percent organic," "organic," or "made with organic (specified ingredients or food group(s))" must comply with the 3-year land requirement pursuant to § 205.202. *See* §205.102 ("Use of the term, 'organic'").

61.     However, Defendant's factory in Thailand has only been in operation since June 2013, when it had merely 1000 rai (or 400 acre) of organic coconut plantation. Based on Defendant's representations online, as of September 2015, it had 3,825 acres of organic coconut farm. *See supra.* In other words, Defendant would have had to convert $3,825 - 400 = 3,425$ acres of conventional farmland to organic farmland in as little as 2 years and 3 months, which would have been impossible because, under § 205.202, the conversion process would take at least 3 years.

62.     In a desperate attempt to conceal the fact that Defendant's operations in Thailand did not start until June 2013, Defendant repeatedly represented the year of 2009 as the year when

---

[4] *Available at* http://www.ams.usda.gov/sites/default/files/media/Organic%20Production-Handling%20Standards.pdf./.

Harmless Harvest started operating. In reality, Defendant did not start selling its Coconut Water Products until 2011 and its factory in Thailand did not start operating (and any effort to convert conventional farmland into organic coconut plantations) until 2013.

63.     Since its inception in or about 2011 till the date of this Complaint, Harmless Harvest has labeled and advertised and continues to label and advertise its Products as "100% ORGANIC" and "USDA ORGANIC."

**The Certifying Agent Bioagricert Failed to Follow USDA Regulations**

64.     Although the USDA sets organic standards, it does not directly certify farmers and processors. Certifying agents accredited by the USDA are responsible for the certification process. A certifying agent can be a private, foreign or state entity.

65.     Harmless Harvest's Coconut Water Products are certified as "USDA Organic" and "100% Organic" by an Italian company by the name Bioagricert, s.r.l ("Bioagricert"). According to Bioagricert's website at http://www.bioagricert.org/, "[t]hird-party agents around the world certify operations to USDA organic standards and Bioagricert is one of them."[5] The website continues to state, that

> "Operators who want to export their products to the US can
>
> - ask the NOP certification and label their products with NOP/USDA organic logo;
>
> - export their products in equivalence with the import certificate.

---

[5] *See* http://www.bioagricert.org/en/certification/organic-production/nop-usa.html.

<u>Bioagricert is able to offer operators both possibilities because it has maintained the NOP/USDA accreditation."[6]</u>

66.   However, having an NOP/USDA accreditation does not mean rubber-stamping a Product with the "USDA Organic" sticker by a certifying agent all of a sudden makes the product organic. Under the USDA regulation, a certifying agent is required to:

a.   Conduct initial on-site inspection (§ 205.403);

b.   Review applications for certification to ensure compliance with the regulations (§ 205.402), which includes the 3-year land requirement under § 205.202;

c.   Verify that information received "accurately reflects the practices used" (§ 205.403(c)(2));

d.   Verify that "prohibited substances have not been and are not being applied to the operation through means which … may include the collection and testing of soil; water; waste; seeds; plant tissue; and plant, animal, and processed products samples." (§ 205.403(c)(3)); and

e.   Conduct on-site inspections annually (§ 205.403(a)) to determine whether the operation should continue.

Moreover, "[w]hen the certifying agent has reason to believe … that an applicant for certification is not able to comply or is not in compliance with the requirements of [the USDA regulations], the certifying agent must" –

•   "Provide a written notification of noncompliance to the applicant" (§ 205.405(a)), and

---

[6] *See id.*

26

- Deny the application to an applicant who fails to take appropriate corrective actions (§205.405(c)(1)(ii)) or fails to respond (§205.405(c)(2)).

67.     Bioagricert, however, never took any soil samples from Defendant's plantation when conducting on-site inspections. Even though Defendant's organic farming operations had not started until June 2013 (and hence the great likelihood that none or very little of its contract farms had not been converted prior to the factory's inception), such did not give Bioagricert enough reasons to believe that taking soil samples to test the level of synthetic chemicals was necessary.

68.     Moreover, as discussed previously, because neither Defendant nor Harmless Harvest Thailand owned farmland, it is not a traditional farming operation where typically the farm would hire workers and would have total control over the tools, fertilizers, insecticide and other supplies used on such plantation. Instead, Harmless Harvest created the so-called "Organic Agriculture and Social Accountability and Fair Trade Standard Project," which is purportedly a contract with the farmers under which the farmers would participate in organic farming training, promise not to use "chemical materials or synthetic fertilizers," etc., and in exchange, Harmless Harvest would buy coconuts from farmers at a "fair price" – which it advertised profusely on the internet and in their other campaign materials.

69.     In reality, Defendant and Bioagricert seldom conducted any inspections to ensure that the farmers actually complied with the terms in the Farmer's Agreement in terms of employing organic farming techniques and refraining from using prohibited synthetic chemicals. As soon as a farmer signs the agreement, Defendant would slap a "USDA Organic" label on the farmer's coconuts and no one would bother to check whether they are organic or not.

70.     Moreover, the fee structure of Bioagricert is highly suggestive of a conflict of interest. Contrary to other certifying agent in the region such as Control Union which charges fixed fees for certification services, Bioagricert charges a percentage of gross export on top of the fixed fees charged. See **EXHIBIT 3**, Bioagricert's fee schedule. As such, Bioagricert is incentivized to aid and abet the licensee (here, Harmless Harvest) in muddling through the organic certification process.

71.     Upon information and belief, the Nam Hom coconut water industry perceived that something was wrong with Harmless Harvest's organic supply, and a complaint was filed with the USDA NOP in late 2013.

**The Representations Are False, Deceptive, and Misleading**

72.     Defendant did not and still does not have sufficient organic farmland to produce organic coconut water at the volume they were producing.

73.     Defendant's conduct deceived and/or was likely to deceive the public. Consumers were deceived into believing that the Products are "100% ORGANIC" and "USDA ORGANIC" when they are not.

74.     Consumers would not know the truth about the Products. Discovery of the true nature of the Products requires investigation beyond the grocery store, and knowledge of organic farming and federal regulations beyond that of the average reasonable consumer.

75.     Harmless Harvest deceptively and misleadingly concealed material facts about its Coconut Water Products that they are not "100% Organic." Harmless Harvest continues to conceal and suppress such material information till this day.

**Location of the Misrepresentations**

76.     Harmless Harvest prominently makes the above false, deceptive, and misleading misrepresentations and omissions on the package of its Coconut Water Products and on their website at www.harmlessharvest.com.

77.     The misrepresentations and omissions were uniform and were communicated to Plaintiffs and to each member of the Class at every point of purchase and consumption.

**Harmless Harvest Knew the Representations Were False**

78.     Harmless Harvest knew that it had represented that its Products are "100% ORGANIC" and "USDA ORGANIC."

79.     Harmless Harvest is governed by and knows the federal regulations that control the labeling of its Products and  knows that its Products are not 100% organic.

80.     Harmless Harvest thus knew all the relevant facts and thus knew that its Coconut Water Products are falsely and deceptively labeled.

**Harmless Harvest Intended for Consumers to Rely on Its Misrepresentations**

81.     Harmless Harvest made the false, deceptive, and misleading representations and omissions intending for Plaintiffs and the Class members to rely upon these representations and omissions in purchasing and ingesting the Products.

82.     Harmless Harvest knew, and independent surveys confirm, that consumers want and will pay a premium for organic products.

83.     In making the false, misleading, and deceptive representations and omissions, Harmless Harvest intended that consumers would buy and pay a premium for organic products, furthering Harmless Harvest's private interest of profiting from the pricing premium, increasing

29

sales of its Products and decreasing sales of the organic products that are truthfully marketed by Harmless Harvest's competitors.

**Consumers Reasonably Relied on Harmless Harvest's Misrepresentations**

84.     Consumers frequently rely on food label representations and information in making purchase decisions.

85.     When Plaintiffs and the Class members purchased Harmless Harvest's Coconut Water Products, Plaintiffs and the Class members saw the deceptive representations and did not receive disclosure of the facts concealed, as detailed above.

86.     Plaintiffs and the Class members were among the intended recipients of Harmless Harvest's deceptive representations and omissions.

87.     Plaintiffs and the Class members reasonably relied to their detriment on Harmless Harvest's misleading representations and omissions. Specifically, Plaintiff and Class members reviewed Defendant's misleading marketing and Product packaging, reasonably relied in substantial part on the labels and were thereby deceived in deciding to purchase the Products for a premium price.

88.     Harmless Harvest's false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiffs, the Class members, reasonable consumers, and the general public.

89.     Harmless Harvest made the deceptive representations and omissions with the intent to induce Plaintiffs and the Class members to purchase its Coconut Water Products. Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed.

90.     Harmless Harvest's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions. Thus, Plaintiffs' and the Class members' reliance upon such representations and omissions may be presumed as a matter of law. The materiality of those representations and omissions also establishes causation between Harmless Harvest's conduct and the injuries sustained by Plaintiffs and the Class members.

**Harmless Harvest's Wrongful Conduct Caused Plaintiffs' Injury**

91.     As an immediate, direct, and proximate result of Harmless Harvest's false, misleading, and deceptive representations and omissions, Harmless Harvest injured Plaintiffs and the Class members in that they:

    a.  paid a sum of money for a product that was not as represented;

    b.  paid a premium price for a product that was not as represented;

    c.  were deprived the benefit of the bargain because the product they purchased was different from what Harmless Harvest warranted;

    d.  were deprived the benefit of the bargain because the product they purchased had less value than what was represented by Harmless Harvest;

    e.  did not receive a product that measured up to their expectations as created by Harmless Harvest;

    f.  were denied the benefit of the beneficial properties of the organic foods promised.

92.     Had Harmless Harvest not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the Class members would not have been injured.

31

Accordingly, Plaintiffs and the Class members have suffered "injury in fact" as a result of Harmless Harvest's wrongful conduct.

93.     Plaintiffs and the Class members all paid money for Harmless Harvest's Coconut Water Products. However, Plaintiffs and the Class members did not obtain the full value of the advertised Product due to Harmless Harvest's misrepresentations and omissions. Plaintiffs and the Class members purchased the Coconut Water Products when they otherwise would not have, or purchased more of, or paid more for, the Coconut Water Products than they would have had they known the truth about the product. Accordingly, Plaintiffs and the Class members have suffered "injury in fact" and lost money or property as a result of Harmless Harvest's wrongful conduct.

**Harmless Harvest Profited from Its Misleading and Deceptive Representations and Omissions**

94.     As the intended, direct, and proximate result of Harmless Harvest's false, misleading, and deceptive representations and omissions, Harmless Harvest has profited from its deceptive and misleading representations by selling its Products at a premium price as follows[7]:

| Brand | Quantity | Price | Unit Price |
|---|---|---|---|
| Nature Factor Organic Coconut Water | 12x10 oz. | $25.08 | $0.21 per oz. |
| ZICO | 12x11.2 oz. | $22.68 | $0.17 per oz. |
| Naked | 12x11.2 oz. | $24.00 | $0.18 per oz. |
| Taste Nirvana Real Coconut Water | 12x9.5 oz. | $24.39 | $0.21 per oz. |
| Vita Coco | 12x11.1 oz. | $21.99 | $0.17 per oz. |
| O.N.E. Coconut Water | 12x16.9 oz. | $30.7 | $0.15 per oz. |
| Amy & Brian Coconut Juice | 12x17.5 oz. | $27.99 | $0.13 per oz. |
| **Harmless Harvest 100% Raw Dark Cacao Coconut Water** | **12x16 oz.** | **$73.85** | **$0.38 per oz.** |

---

[7] All pricing information obtained from www.amazon.com as of October 7, 2015. All prices listed are within Amazon's free shipping program.

| Harmless Harvest Cinnamon & Clove 100% Raw Coconut Water | 12x16 oz. | $123.10 | $0.64 per oz. |
|---|---|---|---|
| Harmless Harvest Organic 100% Raw Coconut Water | 12x16 oz. | $127.53 | $0.66 per oz. |

95.    As the intended, direct, and proximate result of Harmless Harvest's false, misleading, and deceptive representations and omissions, Harmless Harvest has been unjustly enriched through more sales of its Coconut Water Products and higher profits at the expense of Plaintiffs and the Class members. As a direct and proximate result of its deception, Harmless Harvest also unfairly obtained other benefits, including the higher value associated with an organic foods brand and the resulting higher stock value.

## CLASS ALLEGATIONS

**The Nationwide Class**

96.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following nationwide class (the "Class"):

> All persons or entities in the United States who made retail
> purchases of the Products during the applicable limitations period,
> and/or such subclasses as the Court may deem appropriate.

**The New York Class**

97.    Plaintiffs ELIZABETH PEGUERO and KIN FAI LAU bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following New York class (the "New York Class"):

> All persons or entities in New York State who made retail
> purchases of the Products during the applicable limitations period,
> and/or such subclasses as the Court may deem appropriate.

**The California Class**

98.     Plaintiffs GUOLIANG MA and SHARON MANIER bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following California class (the "California Class"):

> All persons or entities in California State who made retail
> purchases of the Products during the applicable limitations period,
> and/or such subclasses as the Court may deem appropriate.

99.     Excluded from the Classes are current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest. Also excluded from the Classes is the judicial officer to whom this lawsuit is assigned.

100.     Plaintiffs bring the Class and the Classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

101.     At this time, Plaintiffs do not know the exact number of members of the Class or the Classes. However, given the nature of the claims and the number of retail stores selling the Harmless Harvest's Coconut Water Products, Plaintiffs believe that there are hundreds of thousands of members and that joinder of all of them is impracticable.

102.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class and the Classes that predominate over questions that may affect individual members include

> a.   whether Harmless Harvest labeled, marketed, advertised, and/or sold its
> Coconut Water Products to Plaintiffs and the other members of the Class and
> the Classes using false, misleading, and/or deceptive statements or

34

representations, including statements or representations concerning the nature, quality, and/or ingredients of Harmless Harvest's Coconut Water Products;

b.  whether Harmless Harvest omitted and/or misrepresented material facts in connection with the sales of its Coconut Water Products;

c.  whether Harmless Harvest participated in and pursued the common course of conduct complained of herein; and

d.  whether Harmless Harvest's labeling, marketing, advertising, and/or selling its Coconut Water Products constitutes an unfair or deceptive consumer sales practice;

e.  whether Defendant has been unjustly enriched at the expense of Plaintiffs and the other Class members by their misconduct;

f.  whether Defendant must disgorge any and all profits they have made as a result of their misconduct; and

g.  whether Defendant should be barred from marketing their Products as "100% ORGANIC," "USDA ORGANIC" and "100% RAW."

103.  Plaintiffs' claims are typical of those of the Class and the Classes because Plaintiffs, like all members of the Class and the Classes, purchased Harmless Harvest's Coconut Water Products, relying on Harmless Harvest's false and misleading representations in a typical consumer setting at Harmless Harvest's price and sustained damages from Harmless Harvest's wrongful conduct.

104.  Plaintiffs will fairly and adequately protect the interests of the Class and the Sub Classes because Plaintiffs are similarly situated with, and have suffered similar injuries as, the

members of the Class and the Classes they seek to represent. Plaintiffs feel that they have been deceived, wish to obtain redress of the wrong, and want Harmless Harvest stopped from perpetrating similar wrongs on others. Plaintiffs are adequate representatives of the Class and the Classes also because their interests do not conflict with the interests of the Class members and Classes members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation, who led the investigation uncovering Harmless Harvest's wrongs, who were the first to publicly uncover Harmless Harvest's wrongs, who have no interests adverse to the members of the Class members or the Classes, and who can and will vigorously prosecute this litigation.

105.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Specifically, no member of the Class or the Classes has a substantial interest in individually controlling the prosecution of a separate action. The damages suffered by each individual Class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Harmless Harvest's conduct. Thus, it would be virtually impossible for the Class members individually to effectively redress the wrongs done to them.

106.    Upon information and belief, there are no pending lawsuits concerning this controversy. Concentration of the litigation concerning this matter in this Court is desirable; the Class is of a moderate size, and the difficulties likely to be encountered in the management of a class action are not great. The resolution of the claims of all Class members and Classes members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

107.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Federal Rule of Civil Procedure 23(b)(2) are met, as Harmless Harvest has acted or refused to act on grounds generally applicable to the Class and the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole and the Classes as a whole.

108.    The prosecution of separate actions by members of the Class or the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Harmless Harvest.

109.    Harmless Harvest's conduct is generally applicable to the Class as a whole and the Classes as a whole and Plaintiffs seek, inter alia, equitable remedies with respect to the Class as a whole and the Classes as a whole. As such, Harmless Harvest's systematic policies and practices make declaratory relief with respect to the Class as a whole and the Classes as a whole appropriate.

110.    The Class and the Classes are specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action. Because Harmless Harvest is both the manufacturer of its private label products and its own retailer, notice to the Class and the Classes can be made through various means, such as in-store leaflets, website advertisements, notices on the labels of the packages, and/or direct notice to those consumers for which Harmless Harvest knows the e-mail or physical mailing address.

## CAUSES OF ACTION

## COUNT I

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

**On Behalf of the New York Class**

111.   Plaintiffs ELIZABETH PEGUERO and KIN FAI LAU reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further allege as follows:

112.   Plaintiffs ELIZABETH PEGUERO and KIN FAI LAU bring this claim individually and on behalf of the other members of the New York Class for an injunction for Defendant's violations of New York's Deceptive Acts or Practices Law, Gen. Bus. Law § 349 ("NY GBL § 349").

113.   NY GBL § 349 provides that deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.

114.   Any person who has been injured by reason of any violation of the NY GBL § 349 may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

115.   The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed that their Products are "100% ORGANIC," "USDA ORGANIC" and "100% RAW" are unfair, deceptive, and misleading and are in violation of NY GBL § 349.

116.   Defendant should be enjoined from marketing their Product as "100% ORGANIC" and "USDA ORGANIC," or in the alternative, Defendant should be enjoined from selling its Coconut Water Products made from non-organic coconuts; Defendant also should be enjoined from marketing their Product as "100% Raw."

38

117.    Plaintiffs ELIZABETH PEGUERO and KIN FAI LAU, on behalf of themselves and all others similarly situated, respectfully demand a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

**COUNT II**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

**On Behalf of the New York Class**

118.    Plaintiffs ELIZABETH PEGUERO and KIN FAI LAU reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further allege as follows:

119.    Plaintiffs ELIZABETH PEGUERO and KIN FAI LAU bring this claim individually and on behalf of the other members of the New York Class for Defendant's violations of NY GBL § 349.

120.    Defendant's business acts and practices and/or omissions alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

121.    The practices of Defendant described throughout this Complaint, were specifically directed to consumers and violate the NY GBL § 349 for, inter alia, one or more of the following reasons:

     a.    Defendant engaged in deceptive, unfair and unconscionable commercial

       practices in failing to reveal material facts and information about the Products,

39

which did, or tended to, mislead Plaintiffs PEGUERO and LAU and the New York Class about facts that could not reasonably be known by them;

b. Defendant knowingly and falsely represented and advertised that the Products are "100% ORGANIC," "USDA ORGANIC" and "100% RAW" with an intent to cause Plaintiffs PEGUERO and LAU and members of the New York Class to believe that the Products are 100% organic and 100% raw coconut water, even though they are not;

c. Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

d. Defendant caused Plaintiffs PEGUERO and LAU and the New York Class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

e. Defendant made material misrepresentations to Plaintiffs PEGUERO and LAU and the New York Class with the intent that Plaintiffs PEGUERO and LAU and the New York Class members rely upon such misrepresentations;

f. Defendant made material representations and statements of fact to Plaintiffs PEGUERO and LAU and the New York Class that resulted in Plaintiffs PEGUERO and LAU and the New York Class reasonably believing the represented state of affairs to not be other than what they actually were; and

g. Defendant intended that Plaintiffs PEGUERO and LAU and the members of the New York Class rely on their misrepresentations, so that Plaintiffs

PEGUERO and LAU and the New York Class members would purchase the Products.

122.    Under all of the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

123.    Defendant's actions impact the public interest because Plaintiffs PEGUERO and LAU and members of the New York Class were injured in exactly the same way as thousands of others purchasing the Products as a result of and pursuant to Defendant's generalized course of deception.

124.    By committing the acts alleged in this Complaint, Defendant has misled Plaintiffs PEGUERO and LAU and the New York Class into purchasing the Products, in part or in whole, due to an erroneous belief that the Products are 100% organic and 100% raw coconut water. This is a deceptive business practice that violates NY GBL § 349.

125.    Defendant's 100% organic and 100% raw claims misled Plaintiffs PEGUERO and LAU, and are likely in the future to mislead reasonable consumers. Had Plaintiffs PEGUERO and LAU and members of the New York Class known of the true facts about the Products, they would not have purchased the Products and/or paid substantially less for another product.

126.    The foregoing deceptive acts, omissions and practices were directed at consumes.

127.    The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiffs PEGUERO and LAU and other members of the New York Class to suffer actual damages in the form of, inter alia, monies spent to purchase the Products. Plaintiffs PEGUERO and LAU and other members of the

41

New York Class are entitled to recover such damages, together with equitable and declaratory relief, appropriate damages, including punitive damages, attorneys' fees and costs.

## COUNT III

### INJUNCTIONS FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (UNLAWFUL FALSE ADVERTISING ACT)

### On Behalf of the New York Class

128.    Plaintiffs PEGUERO and LAU repeat and reallege each and every allegation contained above as if fully set forth herein.

129.    Plaintiffs PEGUERO and LAU bring this claim individually and on behalf of the other members of the Class for violations of NY GBL § 350.

130.    NY GBL § 350 provides that false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state are unlawful.

131.    NY GBL § 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect."

132.    Any person who has been injured by reason of any violation of the NY GBL may bring an action in his own name to enjoin unlawful act or practice, an action to recover his actual damages or five hundred dollars, whichever is greater, or both such actions.  The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to ten thousand dollars, if the court finds the defendant willfully or knowingly violated this section.  The court may award reasonable attorney's fees to a prevailing plaintiff.

133.    As fully alleged above, by advertising, marketing, distributing, labeling and selling the Coconut Water Products to Plaintiffs PEGUERO and LAU and other members of the Class, Defendant engaged in, and continues to engage in, false advertising.

134.    Defendant engaged in false advertising by advertising, marketing, distributing and selling Coconut Water Products as "100% ORGANIC,"  "USDA ORGANIC" and "100% RAW" even though they are not.

135.    Defendant intended that Plaintiffs PEGUERO and LAU and other members of the Class to rely on such misrepresentations in deciding to purchase the Coconut Water Products. Justifiable reliance is no longer an element to a § 350 claim, however, following the New York Court of Appeals case *Koch v. Acker, Merrall & Condit*, NY 3d, 2012 NY Slip Op 02254 (March 27, 2012).

136.    Plaintiffs PEGUERO and LAU and other members of the Class further seek to enjoin such unlawful deceptive acts and practices as described above.  Each of the members of the Class will be irreparably harmed unless the unlawful actions of Defendant are enjoined.

137.    Defendant should be enjoined from labeling their Coconut Water Products and falsely advertising them as "100% ORGANIC,"  "USDA ORGANIC" and "100% RAW" to the detriment of consumers.

138.    In this regard, Defendant has violated, and continues to violate, NY GBL § 350, which makes false advertising unlawful. As a direct and proximate result of Defendant's violation of GBL § 350 above, Plaintiffs PEGUERO and LAU and other members of the Class have suffered damages in an amount to be determined at trial.

**COUNT IV**

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW 350
## (UNLAWFUL FALSE ADVERTISING ACT)

### On Behalf of the New York Class

139.    Plaintiffs PEGUERO and LAU repeat and reallege each and every allegation contained above as if fully set forth herein.

140.    Plaintiffs PEGUERO and LAU bring this claim individually and on behalf of the other members of the Class for violations of NY GBL § 350.

141.    As fully alleged above, by advertising, marketing, distributing, labeling and selling Coconut Water Products to Plaintiffs PEGUERO and LAU and other members of the Class, Defendant engaged in, and continues to engage in, false advertising.

142.    Defendant engaged in false advertising by advertising, marketing, distributing and selling Coconut Water Products as "100% ORGANIC," "USDA ORGANIC" and "100% RAW" even though they are not.

143.    The foregoing false advertising acts were directed at consumers.

144.    Plaintiffs PEGUERO and LAU and other members of the Class suffered a loss as a result of Defendant's false advertising.  Specifically, as a result of Defendant's false advertising, Plaintiffs PEGUERO and LAU and other Class members suffered monetary losses associated with the purchase of Coconut Water Products. Had Plaintiffs PEGUERO and LAU and other Class members known the truth about the Products, they would not have been willing to pay the premium price Defendant charged for the products, or they would not have purchased the products at all.

145.    In this regard, Defendant has violated, and continues to violate, GBL § 350, which makes false advertising unlawful.  As a direct and proximate result of Defendant's violation of

GBL § 350 above, Plaintiffs PEGUERO and LAU and other members of the Class have suffered

damages in an amount to be determined at trial.

## COUNT V

**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
CAL. COV. CODE § 1750, et seq.**

**On Behalf of the California Class**

146.     Plaintiffs GUOLIANG MA and SHARON MANIER reallege and incorporate

herein by reference the allegations contained in all preceding paragraphs and further alleges as

follows:

147.     Plaintiffs MA and MANIER bring this action pursuant to California's Consumer

Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 et seq. and seek to enjoin the unfair,

unlawful, and deceptive acts and conduct of the Defendant as more fully described above.

148.     Defendant is a "person" under Cal. Civ. Code § 1761(c). Plaintiffs MA and

MANIER and the Class members of are aggrieved "consumers" under Cal. Civ. Code § 1761(d),

because they bought the Coconut Water Products for personal, family, or household purposes.

149.     Harmless Harvest's Coconut Water Products are "goods" under Cal. Civ. Code §

1761(a). Plaintiffs MA and MANIER and the Class members' purchases of Harmless Harvest's

Coconut Water Products are "transactions" under Cal. Civ. Code § 1761(e) and § 1770.

150.     Defendant's false and fraudulent representations and omissions have violated, and

continue to violate, the CLRA because they extend to transactions that are intended to result, or

have resulted, in the sale of goods to consumers, including the Plaintiffs MA and MANIER and

the Class members.

151.    Defendant's conduct violates Cal. Civ. Code § 1770(a)(5), which prohibits "[r]epresenting that goods . . . have . . . characteristics [or] ingredients . . . which they do not have," and Cal. Civ. Code § 1770(a)(7), which prohibits: "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another," causing injury to Plaintiffs MA and MANIERand the Class.

152.    As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

153.    Plaintiffs MA and MANIER and the Class members seek punitive damages, preliminary injunctive relief, and permanent injunctive relief against Defendant's unfair and deceptive acts and conduct.

154.    Pursuant to California Civil Code § 1780(a)(2) and (a)(5), Plaintiffs MA and MANIER seek an order of this Court that includes, but is not limited to, an order enjoining Defendant from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

155.    Plaintiffs MA and MANIER and the other members of the California Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

156.    The unfair and deceptive acts and practices of the Defendant, as described above, present a serious threat to Plaintiffs MA and MANIER and the other members of the California Class.

157.    On or about November 17, 2015 prior to filing this action, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code § 1782(a). Plaintiff MA sent Harmless Harvest on behalf of himself and the proposed California Class, a letter

46

via certified mail, return receipt requested, advising Defendant that they are in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiff MA's letter is attached hereto as **EXHIBIT 4**.

158.    On February 26, 2016, Defendant's counsel sent a letter responding to the substance of the November 17, 2015 CLRA notice.  A copy of the letter is attached hereto as **EXHIBIT 5**.

159.    Wherefore, Plaintiffs MA and MANIER and members of the California Class seek damages, restitution, and injunctive relief for these violations of the CLRA.

## COUNT VI

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, et seq.

#### On Behalf of the California Class

160.    Plaintiffs GUOLIANG MA and SHARON MANIER reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

161.    Plaintiffs MA and MANIER bring this action pursuant to California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. Defendant has engaged and continues to engage in unlawful, unfair, or fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, causing injury to Plaintiffs MA and MANIER and the California Class.

162.    By committing the acts and practices alleged herein, Defendant has engaged in deceptive, unfair, and unlawful business practices in violation of the UCL.

47

163.    Plaintiffs MA and MANIER have standing to pursue this claim as they have suffered injury in fact and has lost money or property as a result of Defendant's actions as set forth above. Class members have also suffered injury in fact and lost money or property as a result of Defendant's actions as set forth above.

164.    The violation of any law constitutes an "unlawful" business practice under Cal. Bus. & Prof. Code § 17200.

165.    Defendant's false representations alleged herein violate 21 U.S.C. § 343; 21 U.S.C. § 331; Cal. Civ. Code § 1709; Cal. Civ. Code § 1750 et seq.; Cal. Com. Code § 2313; Cal. Com. Code § 2315; and Cal. Bus. & Prof. Code § 17500 et seq.

166.    Defendant's false representations alleged herein also violate California's criminal laws. Cal. Penal Code § 383 (forbidding the offering for sale food that is adulterated, e.g., "by any means it is made to appear better or of greater value than it really is").

167.    Defendant has violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of (i) the CLRA, and (ii) the FAL.

168.    Defendant's false representations also violate California's Sherman Food, Drug, and Cosmetic Law, which prohibits the advertising, manufacture, sale of adulterated and misbranded foods. Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110550, 110585, 110620, 110625, 110660, 110705, 110740, 110760, 110770, 110765, and 110770.

169.    In relevant part, the Sherman Law declares that food is misbranded if its labeling is false or misleading in any particular way and further provides that it is unlawful for any person to misbrand any food. California Health & Safety Code §§ 110660 and 110765.

170. The Sherman Law defines a "person" as "any individual, firm, partnership, trust, corporation, … and any representative, agent, or agency of any of the foregoing." Cal. Health & Safety Code § 109995. The named defendant is a "person" within the meaning of the Sherman Law.

171. As more fully described herein, Defendant's misleading marketing, advertising, packaging, and labeling of the Coconut Water Products as "100% ORGANIC," "USDA ORGANIC" and "100% RAW" even though they are not, is likely to deceive a reasonable consumer. Indeed, Plaintiffs MA and MANIER and the other California Class members were unquestionably deceived regarding the characteristics of Defendant's Products, as Defendant's marketing, advertising, packaging, and labeling of the Coconut Water Products misrepresents and/or omits the true nature, quality, and/or ingredients of the Coconut Water Products.

172. There is no benefit to consumers or competition from deceptively marketing and labeling products. Indeed, the harm to consumers and competition is substantial. Plaintiffs MA, MANIEr and the other members of the California Class who purchased the Coconut Water Products suffered a substantial injury as alleged herein.

173. Plaintiffs MA and MANIER and the other members of the California Class who purchased the Coconut Water Products had no way of reasonably knowing that the Coconut Water Products they purchased was not as marketed, advertised, packaged, and labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

174. Defendant's acts and omissions alleged above constitute unfair business practices under Cal. Bus. & Prof. Code § 17200 because the gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefor, particularly

49

considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff MA and the other members of the California Class. Defendant's false and misleading representations and omissions also violate legislatively declared policy as they have violated numerous state and federal laws. Moreover, the gravity of the harm to Plaintiffs and Class members resulting from Defendant's conduct outweighs Defendant's legitimate reasons, justifications and/or motives for engaging in such deceptive acts and practices.

175.    Each false and misleading representation and omission constitutes fraudulent business practices under Cal. Bus. & Prof. Code § 17200 because the representations and omissions were false. Defendant knowingly and falsely represented the Coconut Water Products as "100% ORGANIC," "USDA ORGANIC," and "100% RAW" even though they are not.

176.    Pursuant to California Business and Professions Code § 17203, Plaintiffs MA and MANIER and the other members of the California Class seek an order of this Court that includes but is not limited to an order enjoining such future conduct on the part of Defendant and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money paid for Defendant's Coconut Water Products as a result of the wrongful conduct of Defendant.

## COUNT VII

## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17500, et seq.

### On Behalf of the California Class

177.    Plaintiffs GUOLIANG MA and SHARON MANIER reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

178.    Plaintiffs MA and MANIER bring this cause of action pursuant to California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code § 17500 et seq.

179.    Such acts of Defendant, are described above, and each of them constitute unlawful, deceptive, and fraudulent business acts and practices.

180.    At all material times, Defendant engaged in and disseminated advertising, including product package labels, television advertisements, magazine advertisements, internet advertisements, and other marketing in the State of California to the public and offered for sale Harmless Harvest's Coconut Water Products on a nationwide basis, including in California. Defendant knowingly and falsely represented the Coconut Water Products as "100% ORGANIC," "USDA ORGANIC" and "100% RAW" even though they are not.

181.    The misrepresentations and non-disclosures by Defendant of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of Cal. Bus. & Prof. Code § 17500, et seq.

182.    Said advertisements and inducements were made within the State of California and come within the definition of advertising contained in the FAL in that such promotional materials were intended as inducements to purchase Defendant's Products and are statements disseminated by Defendant to Plaintiffs MA and MANIER and the other California Class members. Defendant knew, or in the exercise of reasonable care, should have known, that these representations were misleading and deceptive.

51

183.    Consumers, including Plaintiffs MA and MANIER and the other California Class members, were among the intended targets of such representations. Consumers, including Plaintiffs MA and MANIER and the other California Class members, necessarily and reasonably relied on these materials concerning Defendant's Coconut Water Products.

184.    The above acts of Defendant did, and were likely to, deceive reasonable consumers, including Plaintiffs and the other members of the California Class, by obfuscating the nature, quality, and/or ingredients of the Coconut Water Products, in violation of the "misleading" prong of the FAL.

185.    The business practices alleged above are unlawful under the CLRA, which forbids misleading and deceptive advertising.

186.    Plaintiffs MA and MANIER and the other members of the California Class have suffered injury in fact and have lost money or property as a result of Defendant's violations of the FAL.

187.    As a result, Defendant has been unjustly enriched at the expense of Plaintiffs and the other members of the California Class. Plaintiffs and the California Class, pursuant to California Business and Professions Code § 17535, are entitled to an order of this Court enjoining such future conduct on the part of Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore to any person in interest any money paid for its Coconut Water Products as a result of the wrongful conduct of Defendant.

**COUNT VIII**

**VIOLATION OF THE CALIFORNIA ORGANIC PRODUCTS ACT**
**CAL. HEALTH & SAFETY CODE §§ 110810-110959**

**On Behalf of the California Class**

188.    Plaintiffs GUOLIANG MA and SHAON MANIER reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further alleges as follows:

189.    This action is brought pursuant to the California Organic Products Act of 2003 ("COPA"), Cal. Health & Safety Code §§ 110810-110959.

190.    Plaintiffs MA and MANIER are each a "person" as that term is defined in COPA, Cal. Health & Safety Code § 111910(a).

191.    Defendant has violated and continue to violate the provisions of COPA, Cal. Health & Safety Code § 110820, as described above.

192.    COPA provides for injunctive relief for any violation of COPA and affords standing to "any person" to enforce such violations. See Cal. Health & Safety Code § 111910(a).

193.    COPA further provides that actions for injunctive relief to remedy violations of COPA are not subject to the same restrictions as other actions for injunctive relief. Specifically, COPA provides that "the person shall not be required to allege facts necessary to show, or tending to show, lack of adequate remedy at law, or to show, or tending to show, irreparable damage or loss, or to show, or tending to show, unique or special individual injury or damages." *Id.*

194.    Thus, Plaintiffs MA and MANIER are entitled to preliminary and permanent injunctive relief to restrain Defendant's violations of COPA. Cal. Health & Safety Code § 111910(a).

**COUNT IX**

**(BREACH OF EXPRESS WARRANTY)**

**On Behalf of the Nationwide Class**

195.    Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs and further allege as follows:

196.    Plaintiffs bring this cause of action on Plaintiffs' behalf and on behalf of the nationwide Class and the New York and California Classes, pursuant to New York law for the New York Class, and pursuant to California law for the California Class.

197.    Defendant expressly warranted to Plaintiffs and members of the Class on the package of Harmless Harvest's Coconut Water Products those representations as listed above, including that the Products were "100% ORGANIC," "USDA ORGANIC" and "100% RAW" even though they were not.

198.    These express warranties appeared on each and every package of Harmless Harvest's Coconut Water Products. These affirmations of fact or promises by Defendant relate to the goods and became part of the basis of the bargain.

199.    Plaintiffs and members of the Class purchased Harmless Harvest's Coconut Water Products, believing them to conform to the express warranties.

200.    Defendant breached the express warranties contained on the package of Harmless Harvest's Coconut Water Products. This breach resulted in damages to Plaintiffs and other members of the Class and the Classes, who bought the Coconut Water Products, but did not receive the goods warranted.

54

201.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the Class members did not receive goods as warranted. Plaintiffs and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial and provided Defendant notice. Among other things, Plaintiffs and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above. Moreover, had Plaintiffs and the Class members known the true facts, would not have been willing to pay the premium price Defendant charged for the Products or would not have purchased the Products at all.

## COUNT X

## (NEGLIGENT MISREPRESENTATION)

### On Behalf of the Nationwide Class

202.     Plaintiffs reallege and incorporate herein by reference the allegations contained in all preceding paragraphs of this Complaint, as if fully set forth herein.

203.     Defendant, directly or through their agents and employees, made false representations, concealments, and nondisclosures to Plaintiffs and members of the Class.

204.     In making the representations of fact to Plaintiffs and members of the Class described herein, Defendant has failed to fulfill their duties to disclose the material facts set forth above. The direct and proximate cause of this failure to disclose was Defendant's negligent misrepresentation.

205.     Defendant, in making the misrepresentations and omissions, and in doing the acts alleged above, knew or reasonably should have known that the representations were not true. Specifically, Defendant knew or reasonably should have known that the representations that they

55

Products were "100% ORGANIC," "USDA ORGANIC" and "100% RAW" were false. Defendant made and intended the misrepresentations to induce the reliance of Plaintiffs and members of the Class.

206.    Plaintiffs and members of the Class relied upon these false representations and nondisclosures by Defendant when purchasing the Products, which reliance was justified and reasonably foreseeable.

207.    As a result of Defendant's wrongful conduct, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other general and specific damages, including but not limited to the amounts paid for the Products, and any interest that would have been accrued on those monies, all in an amount to be determined according to proof at time of trial.

**COUNT XI**

**(UNJUST ENRICHMENT)**

**On Behalf of the Nationwide Class**

208.    This cause of action is brought on Plaintiffs' behalf and on behalf of the nationwide Class and the New York and California Classes, pursuant to New York law for the Class and New York Class, and pursuant to California law for the California Class.

209.    As a result of Defendant's deceptive, fraudulent, and misleading labeling, advertising, marketing, and sales of the Coconut Water Products, Defendant was enriched at the expense of Plaintiffs and the other members of the Class and Classes through the payment of the purchase price for Defendant's Coconut Water Products.

210.    Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that it received from Plaintiffs and the other members of the Class and the Classes, in light of the fact that the falsely labeled Products purchased by Plaintiffs and the other members of the Class and the Classes were not what Defendant purported them to be. Thus, it would be unjust or inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the other members of the Class and the Classes for the monies paid Defendant for such Coconut Water Products.

## PRAYER

211.    As a result of the conduct described above, Defendant has been, and will continue to be, unjustly enriched at the expense of Plaintiffs and Class members. Defendant has been unjustly enriched by the profits they have obtained from Plaintiffs and the Class from the purchases of Harmless Harvest's Coconut Water Products made by them, and the higher value of an organic food brand.

212.    As a result of the wrongful business practices described above, Plaintiffs and the members of the Class are entitled to an order awarding Plaintiffs and the Class full restitution and restoration of the money wrongfully acquired by Defendant by means of its deceptive misrepresentations and omissions, in an amount to be proven at trial, plus interest and attorneys' fees, injunctive relief, and any other orders and judgments which may be necessary to disgorge Defendant's profits or ill-gotten gains obtained and to restore any person in interest any money paid for Harmless Harvest's Coconut Water Products as a result of the wrongful conduct of Defendant. If no such order is granted, the Class will continue to be harmed by Defendant's

deceptive acts and practices, and will be irreparably harmed and/or denied an effective and complete remedy.

213.    The above-described deceptive practices of Defendant present a reasonable likelihood of deception to Plaintiffs and members of the Class in that Defendant has systematically perpetrated such acts or practices upon members of the Class by means of false, misleading, and deceptive representations and omissions on the packages of Harmless Harvest's Coconut Water Products and other advertising and marketing.

**WHEREFORE**, Plaintiffs demand judgment on behalf of themselves and the proposed nationwide Class, New York Class, and California Class, providing such relief as follows:

A. Certification of the nationwide Class, the New York Class, and the California Class proposed herein under Federal Rule of Civil Procedure 23(a) and (b)(3); appointment of Plaintiffs as representatives of the nationwide Class, the New York Class, and the California Class; and appointment of their undersigned counsel as counsel for the nationwide Class, the New York Class, and the California Class.

B. A declaration that Harmless Harvest is financially responsible for notifying members of the nationwide Class, New York Class, and California Class of the pendency of this suit;

C. An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendant as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

D.  Restitution, disgorgement, refund, and/or other monetary damages, together with costs, disbursements, including reasonable attorneys' fees pursuant to the applicable statutes and prejudgment interest at the maximum rate allowable by law;

E.  Restitution to the California Class pursuant to California Business and Professions Code §§ 17203 and 17535;

F.  Disgorgement to the California Class pursuant to California Business and Professions Code §§ 17203 and 17535;

G.  Damages, together with costs and disbursements, including reasonable attorneys' fees, pursuant to the applicable statutes;

H.  Injunctive relief on behalf of the nationwide Class and New York Class pursuant to New York General Business Code § 349, enjoining Harmless Harvest's unlawful and deceptive acts;

I.  Injunctive relief on behalf of the California Class pursuant to California Health and Safety Code § 111910(a), California Business and Professions Code §§ 17203 and 17535, and California Civil Code § 1780, enjoining Harmless Harvest's unlawful and deceptive acts;

J.  Monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law with respect to the claims alleged;

K.  Statutory damages in the maximum amount provided by law;

59

L.  Punitive damages in accordance with proof and in an amount consistent with applicable precedent;

M. An award to Plaintiffs and the nationwide Class, New York Class, and California Class members of the reasonable costs and expenses of the lawsuit, including their attorneys' fees;

N.  An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Harmless Harvest as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein; and

O.  Such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs and the Class members hereby demand a trial by jury.

Dated: December 23, 2016                    By:  _____ */s/  C.K. LEE_____
                                                         C.K. Lee, Esq.

                                            **LEE LITIGATION GROUP, PLLC**
                                            C.K. Lee (CL 4086)
                                            Anne Seelig (AS 3976)
                                            Angela Kwon (AK 1396)
                                            Taimur Alamgir (TA 9007)

                                            30 East 39th Street, Second Floor
                                            New York, NY 10016
                                            Tel.: 212-465-1188
                                            Fax: 212-465-1181
                                            *Attorneys for Plaintiffs and the Class*