UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
GUOLIANG MA, ELIZABETH PEGUERO,  :
SHARON MANIER, and KIN FAI LAU,  :     16-cv-7102 (JMA)(SIL)
on behalf of themselves and others similarly  :
situated,  :     AZRACK, J.
  :
               Plaintiffs,  :
  :
-against-  :
  :
HARMLESS HARVEST, INC.,  :
  :
               Defendant.  :
  :
------------------------------------------------------------x

# DECLARATION OF
## C.K. LEE IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF ATTORNEYS' FEES, SERVICE AWARDS, AND REIMBURSEMENT OF EXPENSES

I, C.K. Lee, declare as follows:

1.      I am a partner in the firm of the Lee Litigation Group, PLLC ("LLG") in New York, New York, and Plaintiffs' counsel herein[1]. (LLG referred to as "Class Counsel" or "Plaintiffs' Counsel").

2.      I am one of the lawyers primarily responsible for prosecuting Plaintiffs' claims on behalf of the proposed class. I respectfully submit this declaration in support of Plaintiffs' Unopposed Motion for Approval of Attorneys' Fees, Service Awards and Reimbursement of Expenses.

3.      I make these statements based on personal knowledge and would so testify if called as a witness before the Court.

---

[1] Capitalized terms shall have the meaning ascribed to them in the parties' Settlement Agreement and General Release ("Settlement Agreement").

4. The Court appointed Lee Litigation Group as Class Counsel on May 12, 2017, in conjunction with its Order Preliminarily Certifying Settlement Class, Approving Class Settlement, Approving Class Notice, and Setting Date for Fairness Hearing (ECF No. 11).

5. This Declaration is respectfully submitted in support of Plaintiffs' Motion for Approval of Attorneys' Fees, Service Awards, and Reimbursement of Expenses.

## I. THE SETTLEMENT REPRESENTS A SIGNIFICANT AND POSITIVE RESULT FOR THE SETTLEMENT CLASS

6. The Settlement Agreement and General Release ("Settlement Agreement") between Plaintiffs and Harmless Harvest, Inc. ("Harmless Harvest" or "Defendant") will, if given final approval by the Court, resolve all of the Settlement Class's claims against Defendant.

7. The Proposed settlement (the "Settlement") provides for (1) significant injunctive relief; (2) payment of attorneys' fees and expenses of up to $555,000; and (3) a total payment of up to $20,000 in incentive awards to the four Class Representatives, representing payments of $5,000 each.

8. In addition, the Settlement provides that Harmless Harvest will separately pay up to $350,000 in notice and administration costs to the Claims Administrator.

9. The Settlement provides Class Members with the important and significant injunctive relief of labeling changes.

10. As detailed in the Complaint, Plaintiffs alleged that, through its widespread marketing campaign, Defendant labeled, packaged and advertised its products as "100% ORGANIC" and "USDA ORGANIC" (the "100% organic claims") and "100% RAW" (the "raw claims") even though Defendant, upon information and belief, knew that its products have not been solely made from organic coconuts and were not "raw." Plaintiffs alleged that Defendant

deceived and misled consumers into paying a sizable pricing premium that they would not have paid had they known the truth about Defendant's products.

11. Plaintiffs alleged that Defendant purposefully and knowingly (i) purchased coconuts from coconut plantations which have no organic certification; (ii) purchased coconuts from street vendors whose source of supply is unknown; (iii) purchased "green-washed" coconuts from "brokers" who would certify that the coconuts are organic even though they are not; (iv) caused farmers to sign a "Farmer's Agreement" promising to use organic farming techniques without testing soil sample; and (v) conspired with the organic certifier Bioagricert in obtaining fraudulent organic certification.

12. As to Defendant's representations that the products are "100% Raw," Plaintiffs alleged such representations were false and misleading, as the products lack the traditional characteristics and qualities associated with raw products.

13. In view of the Plaintiffs' claims, the injunctive relief achieved on behalf of the Class is significant. Specifically, as represented in Section 5.1 of the Settlement Agreement, Harmless Harvest has removed all "raw" and "100% Organic" labels from the packaging of products shipped into the United States and agreed that such labeling changes will remain in effect after the Effective Date. Harmless Harvest has further agreed to engage a third party consultant to review Harmless Harvest's product labels for ongoing accuracy for a period of 2 years following final approval.

14. Harmless Harvest will engage an independent third party, Sandy Mays of Wolf DiMatteo & Associates[2], as a consultant and will provide the consultant (for a period of two years after the Settlement Agreement's Effective Date) (the "Compliance Period") with a label

---

[2] Ms. Mays is a neutral expert with over twenty (20) years of experience in organic production and marketing. She works with businesses across the country to oversee the organic certification of products, source organic ingredients and develop organic system plans.

for each current flavor of coconut water and each new flavor of coconut water that is introduced to market. The consultant will review the labels for ongoing accuracy and provide reports of such accuracy to Class Counsel, C.K. Lee. See Settlement Agreement at ¶ 5.4.

15. The consultant will review organic certifications issued to Harmless Harvest and its farming operators for a period of two years from the Settlement Agreement's Effective Date, which would be maintained in a secure, password-protected database that is owned, maintained and controlled by Harmless Harvest. The consultant would review the certifications on a periodic basis and report to me, as Class Counsel, that the certifications appear to be in order. Id at ¶ 5.5.

16. By its labeling changes and the agreement that such labeling changes shall remain in effect, Plaintiffs and the Class have achieved substantially all of the injunctive relief that could have been obtained had the action been litigated to conclusion.

17. If the parties had not been able to settle amicably, the parties would have engaged in protracted litigation, including Defendant's answering the Complaint and/or engaging in motion practice on a motion to dismiss, Court appearances, discovery, depositions (including international witnesses [middlemen, suppliers, farmers, Harmless Harvest employees and coconut experts] who would need to apply for travel visas and fly from Thailand to New York City for deposition), Plaintiffs would have moved for class certification pursuant to Fed. R. Civ. P. 23, Defendant would have opposed such motion or moved for decertification. The parties would have possibly moved for summary judgment, each at significant cost to the parties, along with trial and appellate work.

## II. INVESTIGATION, DISCOVERY, MEDIATION AND THE FILING OF THE COMPLAINT

18. My firm's investigation into Harmless Harvest's products began late in 2014

when I was approached by a potential plaintiff who alleged that Harmless Harvest was not 100% raw.

19. Several months into my investigation, in or about September 2015, I identified contacts in Thailand, who alleged that Harmless Harvest was not raw, nor made from 100% organic coconuts. They alleged that Harmless Harvest was, in actuality, sourcing some of its coconuts from non-organic farms.

20. Based on contacts in Thailand, I scheduled a trip to Bangkok, Thailand to meet with coconut farmers, middlemen and suppliers to further investigate claims against Harmless Harvest and to conduct due diligence prior to commencing litigation.

21. Prior to the investigative trip to Thailand, myself and other attorneys at my office spent extensive time researching the regulation of organic foods, including the federal standards set by the United States Department of Agriculture National Organic Program and the Organic Foods Production Act of 1990. We also researched and analyzed the organic standards and factors including soil quality, animal raising, pest and weed control, and use of input materials, as well as the processes by which materials may be considered raw.

22. On Thursday, October 8, 2015, myself and my colleague, Shanshan Zheng, Esq., flew more than 20 hours to Thailand, via connecting flight through Beijing, China, to conduct in-person due diligence.

23. From October 9, 2015 through October 12, 2015, Ms. Zheng and I ventured into the farmlands of rural Thailand, inspecting coconut farms, taking photos and interviewing witnesses (including coconut farmers, middlemen, suppliers and former suppliers of Harmless Harvest coconuts and other insiders) with the help of a local Thai translator. Some of the photographs we took are published in the Complaint that was filed in this lawsuit.

24. Through our investigation we learned that Defendant allegedly was sourcing coconuts from Ratchaburi, Thailand, and information about such area's certified organic coconut plantations capacity. Based on the live interviews we conducted in Bangkok with suppliers of Defendant, as alleged in the Complaint, we believe Defendant sourced large quantities of non-organic coconuts through various sources, including buying non-organic coconuts from retailers, making on-the-spot purchases from non-organic farms, as well as "green washing" its coconuts from non-organic sources[3].

25. Following my investigative trip to Thailand, on November 17, 2015, LLG sent Harmless Harvest a demand letter on behalf of Plaintiff Guoliang Ma and other members of a putative class. A subsequent letter also was sent to Harmless Harvest by LLG on January 29, 2016.

26. LLG also conveyed to Harmless Harvest a draft Complaint (the "Draft Complaint") on behalf of Plaintiff Ma and a putative nationwide class, asserting false and misleading advertising and violation of various consumer protection and trade practice statutes in each of the fifty states and the District of Columbia (the "Asserted Claims").

27. The Parties entered into a Tolling Agreement on March 18, 2016, which they subsequently amended by a June 1, 2016 Addendum, a June 30, 2016 Second Addendum, a July 19, 2016 Third Addendum, an August 4, 2016 Fourth Addendum, and an August 31, 2016 Fifth Addendum for the purpose of exploring and consummating a settlement. The Tolling Agreement is effective through the date of the filing of the Complaint.

---

[3] Green washing refers to the alleged practice by which coconut farm owners would contract with a middleman referred to as the "broker," who is typically responsible for hiring workers to work on the farm as well as purchasing the coconuts from the farmers. When a broker purchases coconuts from the farmers and resells to a company like Harmless Harvest, they would vouch for the coconuts being organic (even if they are not) by creating a purported "Certificate of Inspection," commonly referred to by the locals as the "COI." In this way, large amounts of non-organic coconuts could enter the supply chain of a company like Harmless Harvest camouflaged as organic coconuts.

28.     Following the exchange of demand letters and responses, the Parties then scheduled a mediation session for June 7, 2016 in San Francisco with Cathy Yanni, Esq., a well–respected JAMS mediator with experience resolving class action suits involving beverage products.

29.     In preparation for the mediation, the Parties exchanged documents and information relating to the Asserted Claims, and they presented detailed mediation statements to Ms. Yanni. I flew to California to engage in the mediation with Ms. Yanni on June 7, 2016.

30.     The mediation before Ms. Yanni was professional but highly contentious, lasting over 8 hours. Although the parties were unable to reach a settlement during mediation, they continued their settlement discussions in the months that followed the mediation, including telephonic negotiations involving Ms. Yanni.

31.     As a result of the Parties' efforts following mediation, after protracted, arm's length negotiations over seven months, and with Ms. Yanni's assistance, the Parties entered into a Settlement Agreement and General Release (the "Settlement Agreement").

32.     In order to obtain Court approval of the class settlement, on December 23, 2016, a putative nationwide class action complaint entitled *Ma, et al. v. Harmless Harvest, Inc*. was filed in the United States District Court for the Eastern District of New York (the "Action").

### III.    THE FEE AND EXPENSE APPLICATION

33.     Plaintiffs' Counsel seeks, pursuant to the Settlement, a fee and expense award of $555,000, which Harmless Harvest agrees to pay in addition to the injunctive relief provided to the Class, the payment of incentive awards, administration fees and consultant fees, which are being paid separately by Defendant.

34. Since Plaintiffs commenced this action, Harmless Harvest has reduced its price per bottle by more than half.

35. It is my understanding that since 2015, the prices Harmless Harvest charges for coconut water have decreased. It is my belief that such price reduction reflects the pricing premium of Harmless Harvest's representations challenged in the Action, which were revised in 2015 and will remain revised pursuant to the terms of the class settlement. If so, it is my belief that Plaintiffs' counsel's fees represent a percentage less than 1% of the total monetary benefit enjoyed by the class.

37. The fee proposed settlement is fair because of the significant risks (i) in ascertaining who would be a member of the class as the details of individuals who bought Harmless Harvest coconut water since 2011 may not be not readily ascertainable, and (ii) in connection with ascertaining which bottles of Harmless Harvest coconut water contained allegedly non-organic coconuts. It is possible that certain batches may have contained 100% organic coconuts, while others did not. It may be difficult to determine which bottles allegedly contained non-organic coconuts. Variations in the supply of coconuts caused by seasonality: during the "rainy season" in Thailand, because coconuts are harvested monthly, there will be more available supply of organic coconuts, however, in the "dry season" there may be less supply. In addition, the "raw" claim is similarly risky. Although Defendant alleges that using their current process, the coconut water may be considered "raw", they still agreed to maintain the removal of the raw designation. Litigation on the raw claim would involve extensive investigation, depositions and expert reports and testimony.

38. The experience, reputation, and ability of the attorneys is another important factor in setting a fair fee. Class Counsel are experienced and skilled practitioners in the class action

field, and have long and successful track records in such cases. Class Counsel has substantial experience with class action litigation and has substantial experience negotiating class settlements. LLG has substantial experience in prosecuting large-scale class actions, and has been appointed class counsel in more than 35 Court certified class action litigations in New York State, in the Eastern and Southern Districts. See *Yuzary, et al v. HSBC BANK USA, N.A.*, No. 12 Civ. 3693 (PGG) (S.D.N.Y. Oct. 2, 2013) ($15 Million Dollar class settlement); *Long, et al. v. HSBC USA, Inc., et al*., No 14 Civ. 6233 (HBP) (S.D.N.Y. Sept. 13, 2016) ($7 Million Dollar class settlement); *Han, et al. v. Sterling National Mortgage Company, Inc., et al*., No. 09 Civ. 5589 (E.D.N.Y. Aug. 9, 2012); *Sierra v. Triple J. Associates of Queens, Inc*., No 12 Civ. 4462 (E.D.N.Y. Nov. 5, 2013), among others.

39. I received a BS/BA from the University of Michigan/Ann Arbor, with concentrations in Biology and Chinese Language & Culture. I received a Juris Doctorate degree from The University of Pennsylvania Law School in 1997. I was admitted to the New York bar in 1998. I am also admitted to the bars of the U.S. Supreme Court, the Second Circuit Court of Appeals, and the United States District Courts for the Eastern, Southern, Western and Northern Districts of New York. I am a member in good standing of each of these bars.

40. Prior to establishing my own firm, I was associated with some of the top firms in New York City, including Clifford Chance, Morrison & Foerster and Schulte Roth & Zabel.

41. Since April 2009, a substantial portion of my practice has been prosecuting class action cases.

42. Anne Seelig has been Senior Counsel to Lee Litigation Group, PLLC since June 2012 and has litigated hundreds of cases. Ms. Seelig graduated from The George Washington University in 2000, and New York Law School in 2003. Ms. Seelig was admitted to the New

York State Bar in 2004 and is also admitted to practice in the Southern and Eastern Districts of New York. Ms. Seelig has practiced law for fourteen (14) years and has specialized in class action litigation since 2012.

43. Shanshan Zheng was employed as an associate at LLG from January 2, 2014 to May 30, 2016. Ms. Zheng graduated from the City University of New York, Hunter College in 2009, and from the George Washington University School of Law in 2013. Ms. Zheng is licensed to practice law in the State of New York and the Southern and Eastern Districts of New York.

44. Angela Kwon has been employed as an associate at LLG since November 2014. Ms. Kwon graduated from Cornell University in 2009, and University of Virginia School of Law in 2013. Ms. Kwon was admitted to the New York State bar in January 2015 and is also admitted to practice in the Southern and Eastern Districts of New York.

45. Taimur Alamgir has been employed as an associate at LLG since January 2016. Mr. Alamgir graduated from the George Washington University Law School in 2015, and Cornell University in 2012. Mr. Alamgir was admitted to the New York State bar in 2016 and is also admitted to practice in the Southern and Eastern Districts of New York.

46. Jasmin Perez has been employed as a paralegal at LLG since May 2012. Ms. Perez graduated from Barnard College of Columbia University in 2012 with a B.A. in Philosophy.

47. Attached hereto as Exhibit A is a schedule that details the amount of time spent by each attorney and paralegal of LLG who performed work on this litigation, as well as the expenses incurred by category. The lodestar calculation is based on LLG's current billing rates. For attorneys and paralegals who are no longer employed at LLG, the lodestar calculation is

based upon the billing rates for such attorneys and paralegals in his or her final year of employment by LLG. The schedule was prepared from contemporaneous records regularly prepared and maintained by LLG. The hourly rates for attorneys and paraprofessionals included in these schedules are commensurate with the hourly rates charged by attorneys and paraprofessionals which have been accepted by courts within and outside of this Circuit.

48. The hourly rates for the attorneys and paralegals at LLG in Exhibit A are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other litigations. Attached as Exhibit B is a copy of a retainer signed by one of LLG's non-contingent defense clients supporting the rates billed and sought herein.

49. As reflected in Exhibit A, the total number of hours expended on this litigation by LLG in connection with the prosecution of this action is 584.4 hours. The total lodestar for LLG is $266,290.00.

50. Included in Exhibit A is a detailed schedule of the unreimbursed expenses incurred by LLG in connection with the prosecution of this case. As detailed in Exhibit A, LLG has incurred a total of $6,762.83 in unreimbursed expenses in connection with the prosecution of this litigation.

51. The expenses incurred in this action are reflected on the books and records of LLG. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.

52. To date, Class Counsel has worked without compensation of any kind, and the fee has been wholly contingent upon the result achieved.

## V. SERVICE AWARDS

53. As stated in detailed in the Notice and as will be explained to Class Members through the Notice Plan, it is also requested that the Court approve for each named Plaintiff an incentive award of $5,000 for their assistance in investigating and litigating this Action, and to compensate them for the inconvenience and time spent in bringing this Action. The service awards total $20,000.

54. Each of the Named Plaintiffs assisted Class Counsel in the investigation and prosecution of this action, and served the Class by being the face of the settlement which became publicized on the internet in December 2016. The Named Plaintiffs were available as needed to discuss the litigation with Class Counsel, and were helpful in preparing the Complaint and mediation statement.

## VI. CONCLUSION

Based on the foregoing, Plaintiffs respectfully move this Court to approve the Attorneys' Fees and Expenses and Service Awards sought herein.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: June 9, 2017
New York, New York

By: /s/ C.K. Lee
C.K. Lee (CL 4086)
Lee Litigation Group, PLLC
30 East 39th Street, Second Floor
New York, New York 10016
Telephone: 212-465-1188